COURT OF APPEALS
DECISION
DATED AND FILED

June 4, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP1927**

STATE OF WISCONSIN

Cir. Ct. No. 2023CV315

IN COURT OF APPEALS
DISTRICT II

DONNA J. PEYER,

    PETITIONER-RESPONDENT,

  V.

JOHN PAUL STRAUSS,

    RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Walworth County: DANIEL S. JOHNSON, Judge. *Affirmed.*

Before Neubauer, Grogan, and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  In this appeal, John Paul Strauss challenges the entry of a harassment injunction order prohibiting him from having contact with Donna J. Peyer.  Based upon our review of the briefs and Record, we affirm the order.

¶2     Peyer filed a petition for a temporary restraining order and injunction hearing following an altercation with Strauss at an O'Reilly's Auto Parts parking lot in May of 2023.  The petition alleged that Strauss advanced on Peyer in the parking lot, calling her names, and showing her a photo of a man while accusing her of cheating on him.  The petition also alleged that Strauss had been in a romantic relationship with Peyer's best friend, who we will henceforth refer to as "Sally," and that Strauss had driven past Peyer's house when Sally was visiting and then had texted Sally, "to let her know he knows she [was] at [Peyer's] home."

¶3     At the injunction hearing, Strauss admitted that he was the first during the altercation to call Peyer "a swear word."  Strauss testified that he was upset with Peyer about her involvement in an alleged affair that took place approximately 40 years earlier.  Strauss said when he saw Peyer in the parking lot on the day in question, he confronted her—swearing, calling her names, and showing her a picture of a person allegedly hurt by the affair.  Strauss acknowledged that the police were called because of the altercation and that the store manager banned him from returning to that particular O'Reilly's.

¶4     Strauss also admitted to taking a photograph of Sally's car while it was parked at Peyer's house just a few months before the altercation at O'Reilly's. Although he claimed the photo had nothing to do with Peyer and instead "had to do with [Sally] and her ongoing continued lies," Strauss

acknowledged that he did know that Sally was visiting the Peyers' home when he took the photo. The photo and an accompanying text message—in which Strauss confronts Sally's son about the fact that his mother was at the Peyers' home when she allegedly claimed to be elsewhere—were admitted into evidence without objection as Exhibit #2.

¶5       At the hearing, two O'Reilly's employees testified that they observed Strauss in Peyer's personal space at various points during the altercation. Both employees saw Strauss approach Peyer's car window while she was in the car and saw him show Peyer what appeared to be a picture from his phone. One of these employees described Strauss as being "in [Peyer's] face." The other observed Strauss calling Peyer "a lot of bad names."

¶6       Additionally, Peyer's husband and a family friend familiar with the Peyer property both testified that the picture Strauss had taken of Sally's car at the Peyer residence, i.e., Exhibit #2, could only have been taken by someone who was on the Peyer property. Peyer's husband explained that their house is situated about 300 feet from the road and that there is a multi-pronged driveway on the property with one avenue leading to the house and another leading to a barn. Peyer's husband testified that to take the kind of picture shown in Exhibit #2, one would have to be in their driveway and not simply on the street.

¶7       Finally, Peyer herself testified about the altercation and the effect that the photo and text message had on her. Peyer testified that as she was about to leave O'Reilly's after having her car serviced, Strauss came up behind her and called her vulgar names. She called him a name in return and told him to leave her alone. He continued screaming as she got into her car and pulled out his phone, showing her a picture on it and saying, "this is who you cheated on." Peyer then

left the parking lot, called the police, and then drove back to O'Reilly's so she could describe Strauss's vehicle to police. Strauss again yelled at her when she returned but ultimately left O'Reilly's, after which time Peyer spoke with police and went to the judicial center to obtain a temporary restraining order. Regarding the photo and text message in Exhibit #2, Peyer testified that Sally's son had shown her the picture and text message and that she found them unsettling—partly because she was concerned about Strauss's "stalker behavior" toward Sally, and partly because she lives on a quiet, country road, and, in her estimation, Strauss would have had to come onto her property to take the picture.

¶8       The trial court found that the facts brought out at the hearing met the definition of harassment set forth in Chapter 813 of the Wisconsin Statutes because they showed Strauss "engaging in a course of conduct or repeatedly committing acts which harass or intimidate the person and which serve no legitimate purpose."

¶9       Regarding the O'Reilly's incident, the trial court found that the protracted yelling and name calling and Strauss's extreme reaction regarding an affair that occurred decades ago harassed Peyer and had no legitimate purpose:

> As far as the O'Reilly incident is concerned, I believe Ms. Peyer's version of the events related to that. It's pretty clear to me from the testimony that Mr. Strauss confronted her at the O'Reilly Auto Parts store. Number one. And number two, from her perspective certainly, this was completely out of the blue and essentially about nothing…. Given the fact that this is about an alleged affair that happened decades ago, this protracted yelling, protracted name-calling, certainly has no legitimate purpose behind it … and [Strauss's] reaction was really extreme. I think that's borne out by the fact that the O'Reilly Auto Parts store employees themselves thought it was extreme.

With respect to the photo text message in Exhibit #2, the trial court found the testimony that the photo could only be taken by someone who was on the Peyer property credible, and that Strauss's being on the Peyer property, considered together with the O'Reilly's altercation, constituted a course of conduct that was harassing and had no legitimate purpose:

> As it relates to the photograph … I believe … that ultimately, in order to take this photograph, you needed to traverse upon the Peyer estate.
>
> The sanctity of one's home is especially important to this Court. It's one of the most important things we have available to us is knowing that when we go home at the end of the day we are safe and there are not people that are going to come onto our property who are uninvited….
>
> Given the fact that there was no lawful reason for Mr. Strauss to be coming upon the Peyer property and him ultimately taking a photograph while on there, that in and of itself could be looked at as behavior that has no legitimate purpose. I know Mr. Strauss's perspective essentially is that he was in the road or there for a legitimate purpose which essentially is to check up on his girlfriend or try to catch her lying or cheating. I think it's just really important to note here that all the people involved here are adults…. [Sally was] not beholden to him and has no requirement at all that … he's allowed to keep track of her. So even under those circumstances, in other words, Mr. Strauss had no legitimate purpose coming onto the Peyer property….
>
> When you add these incidents together, it does create a course of conduct involving the Peyers and Ms. Donna Peyer in particular that's harassing and serves no legitimate purpose. I therefore do find that the petitioner has met her burden of proof in this regard.

¶10 The trial court consequently issued the injunction, and Strauss appeals.

5

¶11    Strauss presents three arguments on appeal. He argues that his trial counsel was ineffective, that Exhibit #2 was wrongly admitted, and that the evidence was insufficient to support the harassment injunction. This court will address each argument in turn.

¶12    With respect to Strauss's argument that his trial counsel was ineffective, we must reject it because this case is a civil matter and there is no right to effective assistance of counsel in civil cases. *See Village of Big Bend v. Anderson,* 103 Wis. 2d 403, 405, 308 N.W.2d 887 (Ct. App. 1981) ("There is no express constitutional guarantee of representation by counsel in a civil matter. Unlike many criminal defendants who are represented by court-appointed counsel, parties in a civil action retain the counsel of their choice. In a criminal case, a defendant's liberty is at stake, and the prosecutorial force of the state is involved.") Rather, "the client's remedy in a civil case is a suit for malpractice." *See id.* at 406.

¶13    Regarding Strauss's argument that Exhibit #2 should not have been admitted, we conclude this issue has been waived because there was no objection at the injunction hearing. "Generally, a party must make an objection in the [trial] court in order to preserve the issue for appeal." *State v. Cole*, 2008 WI App 178, ¶33, 315 Wis. 2d 75, 762 N.W.2d 711. As there is no reason not to apply waiver here, *see id.*, we conclude Strauss has waived his objection to the admission of Exhibit #2.

¶14    Finally, we turn to Strauss's challenge to the sufficiency of the evidence. Strauss argues that we ought to discount Exhibit #2 and its effect on Peyer as evidence of harassment because, in his view, that photo was taken from the street and all testimony to the contrary was not credible. Strauss further argues

that discounting Exhibit #2 leaves only the O'Reilly's altercation, which by itself, is not enough to constitute a "course of conduct" as required by WIS. STAT. § 813.125(1)(am)4.b. (2023-24).[1]  In situations such as this where the appellate court is asked to assess the credibility and weight that the trial court afforded each witness, the appropriate standard of review is whether the findings of fact made by the court are clearly erroneous.  *See* ***Tourtillott v. Ormson Corp.***, 190 Wis. 2d 291, 294-95, 526 N.W.2d 515 (Ct. App. 1994).

¶15    Under the "clearly erroneous" standard of review, we must affirm the trial court's findings of fact even though the evidence could permit a contrary finding as long as the evidence would permit a reasonable person to make the same finding as the trial court.  ***Teubel v. Prime Dev., Inc.***, 2002 WI App 26, ¶12, 249 Wis. 2d 743, 641 N.W.2d 461 (2001).  "To justify reversal of a trial court's finding, the evidence for a contrary finding must itself constitute the great weight and clear preponderance of the evidence."  ***Id.***  In other words, "[t]his court will not reverse a trial court's credibility determination unless we could conclude, as a matter of law, that no finder of fact could believe the testimony."  ***Id.***, ¶13.  We defer to the trial court because it had the opportunity to observe the witnesses and their demeanor.  *See **id.***

¶16    We have reviewed the evidence and the trial court's findings and conclude that a reasonable person could have found that Strauss's conduct in the O'Reilly's parking lot, taken together with evidence of his traversing on Peyer's property, created a course of conduct that harassed Peyer and served no legitimate purpose, contrary to WIS. STAT. § 813.125(1)(am)4.b.  As set forth in more detail

---

[1]  All references to the Wisconsin Statutes are to the 2023-24 version.

above, Strauss admitted to harassing Peyer at O'Reilly's.  Additionally, there was ample evidence that Strauss traversed on Peyer's property without permission in order to catch Sally in a lie.  One could reasonably conclude—as the trial court did—that this course of conduct was harassing and served no legitimate purpose. *See id.*  While Strauss claims that he took the photo in Exhibit #2 from the street, not private property, there was testimony from Peyer, her husband, and a family friend that the photo could only have been taken from within the property.  We cannot discount this testimony just because Strauss has a differing view of its weight and credibility.  *See **Teubel***, 249 Wis. 2d 743, ¶¶12-14.

> *By the Court.*—Order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.